## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIAM MURPHY, individually
and as guardian ad litem on behalf
of A.T. and K.M.; and TANISHA
MURPHY,

Plaintiffs,

v.

Civil Action No. 21-415-CFC

STATE OF DELAWARE,
JUSTICES OF THE PEACE; THE
HONORABLE ALAN DAVIS, in
his official capacity only as Chief
Magistrate of the Justices of the
Peace; CONSTABLE JAMAN
BRISON, individually and in his
official capacity as a Constable of
the Justices of the Peace;
CONSTABLE HUGH CRAIG,
individually and in his official
capacity as a Constable of the
Justices of the Peace; and
CONSTABLE GERARDO
HERNANDEZ, individually and in
his official capacity as a Constable
of the Justices of the Peace,

Defendants.

---

Thomas S. Neuberger and Stephen J. Neuberger, THE NEUBERGER FIRM, P.A.,
Wilmington, Delaware; Sanjay Bhatnagar, SANJAY K. BHATNAGAR,
ATTORNEY AT LAW, Wilmington, Delaware

*Counsel for Plaintiffs*

Caneel Radinson-Blasucci, STATE OF DELAWARE DEPARTMENT OF
JUSTICE, Wilmington, Delaware

    *Counsel for Defendants*


## <u>MEMORANDUM OPINION</u>


March 19, 2024
Wilmington, Delaware

COLM F. CONNOLLY
CHIEF JUDGE

This case arises out of the eviction of Plaintiffs William Murphy and his minor children, A.T. and K.M., from a home Mr. Murphy and his adult daughter, Plaintiff Tanisha Murphy, leased from Kenneth Stanford[1] in Wilmington, Delaware.  Defendants are the Delaware Justice of the Peace Court (JP Court); the Honorable Alan Davis in his official capacity as Chief Magistrate of the JP Court; and Constables Jaman Brison, Hugh Craig, and Gerardo Hernandez,[2] individually and in their official capacities as Constables of the JP Court.  Plaintiffs allege in Count I of the operative Amended Complaint that the JP Court violated Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1972 (Rehab Act), 29 U.S.C. § 794.  D.I. 29 at ¶¶ 4, 214.  Plaintiffs allege in Counts II and III that each of the Defendants violated their constitutional rights under 42 U.S.C. § 1983.  D.I. 29 at ¶¶ 347, 411, 413, 425.

---

[1] Plaintiffs originally named Stanford as a defendant.  *See* D.I. 1.  Stanford and Plaintiffs reached a settlement and I granted the stipulated dismissal of Stanford from the case.  *See* D.I. 25.  The Amended Complaint refers to Stanford as the "Landlord."  *See* D.I. 29 ¶ 37; D.I. 29-1 at 2.

[2] Plaintiff refers to Constable Jamar Brison as "Jaman" Brison in the Amended Complaint and refers to Constable Gerardo Hernandez Bartolomei as Gerardo Hernandez.  *See* D.I. 29; D.I. 31 at 3 nn.2–3.

Pending before me is Defendants' Motion to Dismiss (D.I. 30) under Federal Rule of Civil Procedure 12(b)(6).

## I.   BACKGROUND

The following facts are taken from the allegations in the Amended Complaint, which I must accept as true for purposes of deciding the merits of a Rule 12(b)(6) motion to dismiss. *See Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

In October 2020, Kenneth Stanford owned a residential property located at 329 Townsend Street in Wilmington, Delaware. D.I. 29 ¶¶ 29–30. Stanford at one point leased that property to Viola Wilson. D.I. 29 ¶¶ 118, 155. After Ms. Wilson was "long gone," Stanford rented the property to William Murphy, a 52-year-old, legally blind Delaware resident. D.I. 29 ¶ 5, 155. Mr. Murphy moved into 329 Townsend Street with his two minor children, A.T. and K.M., on November 17, 2020. D.I. 29 ¶ 38. Unbeknownst to Mr. Murphy, while Mr. Murphy was living at 329 Townsend Street, Stanford wrongfully obtained an eviction order for 329 Townsend Street in the name of Viola Wilson (the Order). D.I. 29 ¶ 155.

On February 11, 2021, Constables Brison, Craig, and Hernandez (the Constable Defendants) arrived at 329 Townsend Street to execute the Order. D.I. 29 ¶¶ 40–47. Mr. Murphy went to the door with his cane to speak to the Constable Defendants. D.I. 29 ¶ 51. The Constable Defendants knew from Mr.

Murphy's appearance—"from his use of his cane, to the look of his eyes, to the way he steadied himself with his hands"—that he was blind. D.I. 29 ¶ 56. They also realized that Mr. Murphy was not the person named in the Order: Viola Wilson. D.I. 29 ¶ 57. Mr. Murphy told the Constable Defendants that he thought Viola Wilson was a former tenant because mail addressed to her still came to 329 Townsend Street. D.I. 29 ¶ 118.

Constable Brison informed Mr. Murphy that he had an eviction order, "that no one was supposed to be inside," and that Mr. Murphy had 30 minutes to leave the premises. D.I. 29 ¶ 63. Mr. Murphy explained that he had a legal right to be at 329 Townsend Street, and when Constable Brison stated, "[Y]ou haven't even produced a lease," Mr. Murphy retrieved a copy of his lease and handed it to Constable Brison. D.I. 29 ¶¶ 64–68.

Constable Brison read the lease agreement and cross-checked the name on the lease with the name on the Order; he found that Stanford was named on both documents. D.I. 29 ¶ 72. Constable Brison took the lease to his car and reread it. D.I. 29 ¶ 73. He then brought it back to Mr. Murphy and stated that "anyone could have made up" the lease that Mr. Murphy had given him and that it had not been notarized or "watersealed." D.I. 29 ¶¶ 74–75. (At some point during the eviction process, Stanford arrived at 329 Townsend Street. D.I. 29 ¶ 138. The Constable

Defendants questioned him about the lease, and he confirmed that he did not have his leases notarized or watermarked.  D.I. 29 ¶ 121.)

The Constable Defendants called their supervisor, Chief Constable Garcia, for instructions on how to proceed.  D.I. 29 ¶ 127.  The Amended Complaint quotes Constable Brison's report regarding the eviction, in which he states: "I quickly contacted Chief Garcia to advise[] him of the situation.  Chief Garcia told me that since we had an eviction order from the court everyone needed to vacate the dwelling and contact the court to dispute the order."  D.I. 29 ¶ 129.

Mr. Murphy offered to show the Constable Defendants other documentation, but rather than reviewing the proffered documentation, the Constable Defendants informed Mr. Murphy "that his only legal option was to go to JP Court #11 and file a lawsuit challenging the Constables' actions."  D.I. 29 ¶¶ 83–85, 88.  After gathering some belongings, Mr. Murphy and his minor children left 329 Townsend Street.  D.I. 29 ¶¶ 95–96.  As Mr. Murphy was leaving, he asked the Constable Defendants how he "could get the mix-up sorted out," and Constable Brison replied that Mr. Murphy should go to JP Court #11 and "file a complaint for wrongful eviction."  D.I. 29 ¶¶ 100–01.[3]  Tanisha Murphy's boyfriend arrived to

---

[3] Constable Brison's report states that he told Mr. Murphy that the "eviction would have to stay in place and everyone in the dwelling would have to leave by order of the Court," but that he "should gather [his lease agreement and government

assist Mr. Murphy and asked why Mr. Murphy was being evicted. D.I. 29
¶¶ 102–05. Constable Hernandez responded that Mr. Murphy's "only legal option
was to go to JP Court #11 to get the matter resolved" and upon request provided
the address for JP Court #11. D.I. 29 ¶¶ 107–08.

Mr. Murphy went that day to JP Court #11, where he explained what had
happened to the Court Clerk, who provided Mr. Murphy with forms and guidance
on how to complete them. D.I. 29 ¶¶ 139, 141–42. Mr. Murphy filled out "what
[was], in essence, a Complaint for unlawful eviction; and [] a Request for a
Forthwith Summons" explaining the emergency nature of his situation. D.I. 29
¶ 144. Four days later, on Monday, February 15, 2021, the JP Court approved an
expedited hearing and set a trial date for Thursday, February 18, 2021. D.I. 29
¶ 149. The hearing took place seven calendar days after Mr. Murphy and his minor
children were evicted on February 11. D.I. 29 ¶ 152.

The emergency hearing "was ably and fairly conducted" by Deputy Chief
Magistrate Sean P. McCormick. D.I. 29 ¶ 153. At the hearing, Deputy Chief
Magistrate McCormick read Stanford his *Miranda* rights and then questioned
Stanford, who chose not to speak other than to say, "I wish to seek counsel."
D.I. 29 ¶¶ 157–58. Deputy Chief Magistrate McCormick later issued an opinion in

_____

assistance documentation] and quickly take it to [the] Justice of the Peace Court."
D.I. 29 ¶ 132 (first alteration in original).

which he concluded that Stanford "had abused the resources of the Court and weapon[iz]ed a writ meant for a previous tenant by filing an eviction action [] against a prior tenant named Viola Wilson, who no longer lived at 329 Townsend Street" and that Stanford "used the eventual writ of eviction issued in the case against Viola Wilson [] to wrongfully evict the Murphy family." D.I. 29 ¶ 160 (internal quotation marks omitted). Deputy Chief Magistrate McCormick also found that Stanford "had likely perjured himself on several occasions in his sworn submissions to the JP Court" in several lawsuits related to the 329 Townsend Street property. D.I. 29 ¶ 160. Deputy Chief Magistrate McCormick "[r]eferred the matter to the Delaware Department of Justice to conduct a criminal investigation" and gave Mr. Murphy the option to move back into the 329 Townsend Street property. D.I. 29 ¶¶ 160–61. Mr. Murphy chose to terminate his lease agreement with Stanford instead, and on February 24, 2021, Plaintiffs retrieved their possessions from 329 Townsend Street. D.I. 29 ¶ 162–63.

## II.    LEGAL STANDARDS

To state a claim upon which relief can be granted a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but the complaint must set forth enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

6

544, 570 (2007).  A claim is facially plausible when the factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

## III.   DISCUSSION

### A.   Count I (The ADA and the Rehab Act Claims)

In Count I, Plaintiffs allege that the JP Court violated Title II of the ADA and § 504 of the Rehab Act.  D.I. 29 ¶¶ 4, 214.  The substantive standards for determining liability under the ADA and Rehab Act are essentially the same, so I will analyze these claims together.  *See Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021).  To survive a motion to dismiss, a plaintiff must plausibly allege that: "(1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."  *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018) (internal quotation marks and citation omitted).  "Causation standards are different under the ADA and [Rehab Act]—under the [Rehab Act], the disability

must be the sole cause of the discriminatory action, while the ADA only requires but-for causation." *Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285, 291 n.25 (3d Cir. 2019) (citation omitted).

The parties' sole dispute is whether Plaintiffs have sufficiently pleaded causation. Defendants argue that Plaintiffs have failed to allege a causal connection between Mr. Murphy's claimed injuries and his disability. D.I. 31 at 7. According to Defendants, "Plaintiffs do not—and cannot—allege that the Murphy family was evicted because Mr. Murphy was blind, or that Plaintiffs suffered any injury during their eviction that was a direct result of Mr. Murphy's blindness." D.I. 31 at 7. Plaintiffs respond that they have "explicitly" pleaded causation "in detail" and point to paragraphs 294 through 295 and 342 through 344 of the Amended Complaint. D.I. 33 at 6.

Paragraphs 342 through 344 contain only conclusory assertions of causation. *See* D.I. 29 ¶¶ 342–44 ("There is a direct causal relationship between defendants' actions and the harm Plaintiffs suffered. Defendants' actions were the 'but for' cause of Plaintiffs' injuries. As a direct and proximate result of defendants' actions, Plaintiffs have been injured."). They are therefore insufficient to state a claim. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

8

Paragraph 294 consists of two sentences:

> If Plaintiff Murphy, the only adult living on the premises, was able to see, and a notice was posted on his front door or a letter was mailed to him referring to an eviction action against a different persons, despite not being legally required, a sighted person may have been able to learn of and/or participate in the wrongfully initiated eviction action and thereby prevent it. But since he is blind he was discriminated against in the services, programs or activities of the Justices of the Peace which favor those who are not blind and grant them the opportunity to participate in the court process even when formal notice is absent.

D.I. 29 ¶ 294. The problem with the first sentence is that it is hypothetical as opposed to factual. Plaintiffs do not allege that a notice had been posted on Murphy's door or that a letter had been mailed to him. Nor do they allege more generally that the JP Court provided Mr. Murphy with notice in a form that would have been adequate for a sighted person but inadequate for a blind person.[4] On the contrary, Plaintiffs expressly allege they "lacked any knowledge or notice that [they were] in danger of being evicted from [the] [] Home." D.I. 29 ¶ 115.

---

[4] The Amended Complaint states that two of the Constables Defendants' reports refer to a notice from the JP Court posted on Mr. Murphy's door that he had received, but the Amended Complaint does not allege that this statement is accurate or that Mr. Murphy received notice of the eviction. *See* D.I. 29 ¶¶ 124–126. The Amended Complaint also questions the reliability of these reports. *See* D.I. 29 ¶ 137.

The problem with the second sentence is that it is a conclusory assertion, and the Amended Complaint is devoid of factual allegations that plausibly imply that but for Mr. Murphy's blindness he could have participated in and prevented the JP Court's eviction process instigated by Stanford.

In paragraph 295 of the Amended Complaint, Plaintiffs allege:

> [O]nce the three Constable defendants on the scene realized Murphy was blind and totally unaware of any legal proceedings directed to his constitutionally fortified Home, their training in dealing with those governed by the ADA and the Rehab Act required them to stand down[5] since they knew they were dealing with a disabled person protected by several major federal disability laws, two of the strikingly few to which Congress has attached such importance as to explicitly waive the Eleventh Amendment immunity otherwise enjoyed by the States. But by refusing to act in accord with the ADA and the Rehab Act they discriminated against Plaintiff and denied him the benefits of the services, programs or activities of their court system.

D.I. 29 ¶ 295 (footnote added).  Bare-bones allegations that Defendants did not act in accordance with the ADA and Rehab Act, however, are insufficient to state a claim.  *See Fowler*, 578 F.3d at 210.  And although Plaintiffs identify in paragraph 233 of the Amended Complaint thirteen "benefits and services" they say they were

---

[5] Plaintiffs do not cite provisions of the ADA or the Rehab Act that required the Defendants to "stand down." *See* D.I. 29; *see also* 28 C.F.R. §§ 35.104, 35.130, 35.160, Pt. 35, App. A, Pt. 35, App. B.

denied in the JP Court,[6] and the denial of such procedural protections can be a form of discrimination, alleging such a denial does not eliminate the causation requirement. *See Geness v. Cox*, 902 F.3d 344, 362 (3d Cir. 2018) ("These procedural protections are designed to avoid undue delays and safeguard the fair and efficient functioning of the criminal justice system, and the denial of those protections, *leading to* the 'unjustified institutional[ization] . . . of persons with disabilities,' is 'a form of discrimination.'" (emphasis added) (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999)). Because of the absence of allegations that causally link Mr. Murphy's disability to the Constable Defendants' actions or omissions, paragraph 295 by itself or read with the other paragraphs of the Amended Complaint does not plausibly imply causation.

---

[6] Plaintiffs allege in paragraph 233 of the Amended Complaint thirteen "benefits and services" from which Plaintiffs were excluded or denied: (1) "[s]ervice of a summons or other process in a legal proceeding affecting their legal rights"; (2) acquisition of personal jurisdiction in such a proceeding; (3) "[l]ater Rule 5 service of pleadings in an eviction affecting their legal rights"; (4) "[t]he statutory right of a jury trial before being deprived of their Home"; (5) "[s]ummary possession requirements under 25 Del. C. §§ 5704-06"; (6) "[e]viction protections under multiple COVID Administrative and Standing Orders of the Justice of the peace Court and the Governor's Emergency Declarations"; (7) "Federal and State Procedural Due Process requirements"; (8) "Federal and State seizure requirements"; (9) "[r]equired statutory 60 day notice of termination of a lease"; (10) "[s]tatutory right to occupy a leasehold under 25 Del. C. § 5148"; (11) "[s]tatutory right to the correct person in an eviction proceeding"; (12) "[s]tatutory summary possession proceeding rights"; and (13) "[o]ther protections of the Delaware Residential Landlord-Tenant Code." D.I. 29 ¶ 233.

Accordingly, I will grant Defendants' motion to dismiss Count I.

## B.    Counts II and III (§ 1983 Claims)

Plaintiffs allege in Count II of the Amended Complaint that their eviction from 329 Townsend Street violated the Due Process Clause of the Fourteenth Amendment.  D.I. 29 ¶ 411.  They allege in Count III that the eviction constituted an unconstitutional seizure in violation of the Fourth Amendment.  D.I. 29 ¶¶ 413–16.  Plaintiffs pursue these claims against all Defendants under 42 U.S.C. § 1983.  D.I. 29 ¶¶ 411, 425.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  States and governmental entities that are considered arms of a state for Eleventh Amendment purposes are not persons under § 1983.  *Will v. Michigan Department of State Police*, 491 U.S. 58, 70–71 (1989).  Such entities cannot be sued under § 1983 for either damages or equitable relief.  *Id.* at 66 ("Section 1983 provides a federal forum to remedy many deprivations of civil

liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.").

Individuals employed by state governments may be considered persons under § 1983 depending on the capacity in which they are sued and the relief sought. Such individuals may be sued in their official capacities for prospective equitable relief under § 1983. *Id.* at 71 n.10 (citing *Ex Parte Young*, 209 U.S. 123, 159–60 (1908)) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." (internal quotation marks omitted)). They may also be sued in their individual capacities for damages or equitable relief under § 1983.

### 1. The JP Court

Plaintiffs do not dispute Defendants' argument that the JP Court is an arm of the state and is therefore not a person under § 1983. *See* D.I. 31 at 12–13; D.I. 33; D.I. 29 ¶ 9 ("Defendant 'State of Delaware, Justices of the Peace' is an arm of the State of Delaware."). Defendants are correct that, as an arm of the state, the JP Court is not subject to suit under § 1983 for either damages or equitable relief. *Will*, 491 U.S. at 66, 70–71. Accordingly, I will dismiss Counts II and III against the JP Court.

### 2.  The Individual Defendants in Their Official Capacities

Defendants argue—and Plaintiffs do not dispute—that under *Will*, the individual Defendants are not persons under § 1983 to the extent they are accused of acting in their official capacity.  *See* 491 U.S. at 70 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself. . . . We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.") (citations omitted).  *Will*, however, does not limit Plaintiffs' ability to sue these Defendants for prospective equitable relief.  *See* 491 U.S. 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." (internal quotation marks and citations omitted)).  Under *Ex Parte Young*, a plaintiff may proceed against state officials in their official capacities if the plaintiff's complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (citation omitted).

Plaintiffs, however, cannot seek relief under *Ex Parte Young* here because there are no factual allegations in the Amended Complaint that plausibly imply that Defendants are engaged in an ongoing violation of federal law.  Plaintiffs state in

conclusory fashion that Defendants have an "evict first, ask questions later policy," but they do not allege any *facts* to support this assertion. *See* D.I. 29 ¶¶ 79, 86, 341, 348, 407, 421. Plaintiffs have not, for example, cited to any JP Court record or statement suggesting the existence of such a policy. *See* D.I. 29. Nor have they provided a factual basis for inferring that the JP Court or the Constable Defendants instituted an equivalent, but unspoken, custom or norm. *See* D.I. 29.

On the contrary, the events alleged to have led to and followed the Murphys' eviction undermine Plaintiffs' claim that such a policy exists. The allegations in the Amended Complaint make clear that what happened to the Murphys was an aberration brought about by a private actor's abuse of the law. According to the Amended Complaint, Stanford wrongfully obtained an eviction order by "abus[ing] the resources of the Court" and then "weapon[izing] a writ meant for a previous tenant." D.I. 29 ¶¶ 155, 160 (internal quotation marks omitted). Plaintiffs do not allege that other landlords will or even are likely to obtain writs of eviction against their tenants by making false representations to the JP Court like those made by Stanford. *See* D.I. 29.

In the absence of any factual allegations to support the existence of an evict first, ask questions later policy, Plaintiffs' "mere conclusory statements" that such a policy exists are not sufficient to state a claim for relief. *See Iqbal*, 556 U.S. at 678. Plaintiffs have therefore failed to plead an ongoing violation of federal law

that would support their claim under *Ex Parte Young*. *See Verizon Maryland*, 535 U.S. at 645.

Accordingly, I will dismiss Counts II through III against Chief Magistrate Davis and the Constable Defendants in their official capacities.

### 3.    The Constable Defendants in Their Individual Capacities

The only remaining claims under Counts II and III are against the Constable Defendants in their individual capacities for violations of the Fourteenth and Fourth Amendments. *See Hafer*, 502 U.S. at 23 ("State officials sued in their individual capacities are persons for purposes of § 1983." (internal quotation marks omitted)); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." (emphasis in the original)). Officials sued in their individual capacity, however, "may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer*, 502 U.S. at 25. Defendants argue here that two personal immunity defenses bar the claims against them—quasi-judicial immunity and qualified immunity—and that Counts II and III should therefore be dismissed. D.I. 31 at 16–18.

### a.   Quasi-Judicial Immunity

Quasi-judicial immunity extends immunity to those who serve as "arms of the court, fulfilling a quasi-judicial role at the court's request." *Russell v. Richardson*, 905 F.3d 239, 249 (3d Cir. 2018) (internal quotation marks and citation omitted).  As a result, court administrators, sheriffs, and constables "charged with the duty of carrying out facially valid court orders, enjoy[] quasi-judicial immunity from liability for damages in a suit challenging conduct prescribed by th[ose] order[s]." *Addlespurger v. Corbett*, 461 F. App'x 82, 85 (3d Cir. 2012) (citation omitted).  Even when sued in their individual, rather than their official capacities, such individuals may receive the benefit of quasi-judicial immunity. *Hamilton v. Leavy*, 322 F.3d 776, 782–783 (3d Cir. 2003)

Delaware has entrusted JP Court constables with the duty of carrying out eviction orders issued by the JP Court. *See* 10 *Del. C.* § 2802(c) (authorizing constables to "[e]xecute all lawful orders, warrants and other process directed to a constable by a justice of the peace" and to "[e]xecute all writs of possession issued pursuant to § 5715 of Title 25 directed to the constable by a justice of the peace"); *see also* 25 *Del. C.* § 5715(a) ("Upon rendering a final judgment for [the landlord], but in no case prior to the expiration of the time for the filing of an appeal or motion to vacate or open the judgment, the court shall issue a writ of possession directed to the constable or the sheriff of the county in which the property is

located, *describing the property and commanding the officer to remove all persons and put the [landlord] into full possession.*" (emphasis added)).  Accordingly, under Delaware law, a constable's quasi-judicial function includes removing all persons from a property described in a writ of possession (like the Order at issue here) issued by the JP Court.  Thus, the Constable Defendants are entitled to quasi-judicial immunity for executing the facially valid Order.  *See Nemeth v. Off. of Clerk of Superior Ct. of New Jersey*, 837 F. App'x 924, 928 (3d Cir. 2020) (holding that a sheriff was entitled to quasi-judicial immunity for executing a facially valid deed of foreclosure); *Villarreal v. New Jersey*, 803 F. App'x 583, 588 (3d Cir. 2020) ("Law enforcement officials executing a facially valid court order are protected by absolute quasi-judicial immunity." (internal quotation marks and citation omitted)).

Plaintiffs argue that the manner in which the Constable Defendants executed the Order was improper and therefore outside the bounds of quasi-judicial immunity.  *See* D.I. 33 at 19–21.  They cite in support of this argument *Russell v. Richardson*, 905 F.3d 239 (3d Cir. 2018).  In *Russell*, the Third Circuit declined to extend immunity to a Virgin Islands Superior Court Marshal who was alleged to have used excessive force in carrying out a court order.  905 F.3d at 251.  The Third Circuit looked to the Marshal's functions under Virgin Islands law, including "execut[ing] all writs, processes and orders of the Superior Court, and perform[ing]

such other duties incident to the execution of those writs, processes, and orders." *Id.* at 251 (alterations in original) (internal quotation marks omitted).  The court stated that "while those functions, with which the Marshals are lawfully entrusted, are fully protected by quasi-judicial immunity, the use of excessive force in the performance of those functions is neither at the direction of the judge, nor a duty incident to the execution of the judge's order." *Id.* (internal quotation marks and citation omitted).

Here, however, unlike in *Russell*, Plaintiffs' Fourth and Fourteenth Amendment claims are directed at the Constable Defendants' act of carrying out a court order, not at the manner in which the Constable Defendants carried out the court order.  For instance, in Count II, the Plaintiffs allege that the Constable Defendants carried out the Order without first giving the Plaintiffs an opportunity to challenge the Order.  D.I. 29 ¶ 348.  The crux of Plaintiffs' argument is that the Constable Defendants should not have carried out the Order at that time, not that they should have carried it out differently.  Similarly, in Count III, Plaintiffs allege that the Constable Defendants violated their Fourth Amendment rights by seizing their home when the Constable Defendants carried out the court-ordered eviction despite Plaintiffs' challenge to the Order.  D.I. 29 ¶ 420.  These are not allegations that the Constable Defendants acted in a manner that was inconsistent with their

duties under Delaware law to execute the Order, but rather that the Order itself was unconstitutional.

Because an "officer's fidelity to the specific order[] of the judge marks the boundary for labeling [his] act 'quasi-judicial,'" *Russell*, 905 F.3d at 250, and Plaintiffs' Fourth and Fourteenth Amendment Claims are directed at the Constables Defendants' acts pursuant to a facially valid court order, insofar as Counts II and III are alleged against the Constable Defendants in their individual capacities they are barred by quasi-judicial immunity.

Accordingly, I will dismiss Counts II through III against the Constable Defendants.

### b.     Qualified Immunity

Because the Constable Defendants enjoy quasi-judicial immunity with respect to Counts II and III, and in light of the scant attention the parties gave in their briefing to Defendants' qualified immunity arguments, I need not and do not address whether Counts II and III should be dismissed against the Constable Defendants on qualified immunity grounds. *See* D.I. 31 at 16–17; D.I. 33.

## IV.   CONCLUSION

For the reasons stated above, I will grant Defendants' Motion to Dismiss (D.I. 30).  The Court will issue an Order consistent with this Memorandum Opinion.